HUNTER, JR., ROBERT N., Judge.
 

 *589
 
 Plaintiff appeals from a trial court order granting summary judgment in favor of Defendants. The trial court stated Plaintiff failed to introduce
 
 *590
 
 evidence showing proximate causation, an element of medical malpractice. We reverse the trial court's grant of summary judgment.
 

 I. Factual and Procedural Background
 

 On 18 March 2013, Plaintiff filed an unverified complaint alleging Dr. Duberman committed medical malpractice during an operation on Plaintiff's arm. Plaintiff alleged the following acts of negligence: failure to perform tests to determine the nature of Plaintiff's benign tumor, failure to perform tests to rule out any nerve or vascular involvement, failure to identify and protect Plaintiff's right median nerve, and negligent injury to Plaintiff's right median nerve. In failing to perform these tests and in these actions, Plaintiff alleges, Dr. Duberman
 
 *553
 
 failed to provide medical care in accordance with the training and experience of a physician practicing in the same or a similar community. Plaintiff alleges that her injuries were a "direct and proximate result of [Dr. Duberman's] negligence[.]" The complaint also names Western Wake Surgical as a defendant, asserting Dr. Duberman's negligence occurred within the scope of his duties as an employee. To comply with Rule 9(j) of the North Carolina Rule of Civil Procedure, Plaintiff stated the following:
 

 [T]he medical care rendered by the defendants and/or their employees and agents and all medical records pertaining to the alleged negligence that are available to the plaintiff after reasonable inquiry have been reviewed by persons who are reasonably expected to qualify as expert witnesses under Rule 702 of the Rules of Evidence and who are prepared and willing to testify that the medical care provided to [Plaintiff] did not comply with the applicable standards of care.
 

 On 17 May 2013, Defendants Duberman and Western Wake Surgical filed an unverified answer generally denying Plaintiff's allegations. In addition, Defendants asserted the defenses of contributory negligence and failure to comply with Rule 9(j) as well as a statutory cap on damages.
 

 Defendants filed a motion for summary judgment on 17 October 2014. In their motion, Defendants argued no genuine issue of material fact existed as to "whether any act or omission by defendants was a proximate cause of Plaintiff's alleged injury." In support of their motion, Defendants filed the transcripts of five depositions, which we summarize below.
 

 *591
 

 A. Plaintiff's Deposition
 

 First, Defendants attached the transcript of Plaintiff's deposition taken 27 September 2013. Plaintiff, born in Kabul, Afghanistan, moved to California in 1980. When she moved to North Carolina around the year 2000, she had no ongoing medical problems other than dry eyes. Around 2006, she began to experience a pressure on her head. Following an MRI, doctors found a tumor in her head, and she had to undergo surgery. After the surgery, Plaintiff no longer felt the pressure in her head.
 

 Subsequently, she noticed a swelling on her right arm. Approximately a month after noticing the swelling, she made an appointment with Dr. Newman. He told her the swelling was a "fatty lump" which could be removed by surgery. Dr. Newman referred Plaintiff to a surgeon, Dr. Duberman. Plaintiff made an appointment with Dr. Duberman, and went to his office where he examined her arm. He also diagnosed the swelling on Plaintiff's arm as a fatty tumor or lipoma. Dr. Duberman then discussed surgery options with Plaintiff. He explained she could undergo the procedure while awake, with local anesthesia, or she could be put to sleep for the procedure. He said the procedure would be "simple" so Plaintiff chose local anesthesia.
 

 On the day of the procedure, Dr. Duberman administered a local anesthetic. Plaintiff said the procedure hurt "[a] lot," explaining she started screaming "[a]s soon as he start[ed] cutting [my] arm." She believed the procedure lasted approximately one hour, during which time Dr. Duberman gave her additional local anesthesia. The second dose of local anesthesia was not enough to quell the pain, so Dr. Duberman stopped and decided to schedule a time to conclude the procedure under sedation because she was unable to miss work.
 

 Plaintiff scheduled the second surgery for 13 April 2012, approximately six months after the first attempted procedure. She did not undergo any tests or scans before the second surgery. Before the operation, Dr. Duberman estimated it would take him one-and-a-half hours to remove the mass. The surgery took three hours because the tumor was too deep and there was bleeding.
 

 On 14 April 2012, Plaintiff called Dr. Duberman because she experienced pain and numbness in her fingers. He assured her the pain and numbness was normal. The next day, Plaintiff's pain and numbness increased and she could not hold things. She called Dr. Duberman again, and he said, "I didn't do anything wrong." She told him she thought a nerve may be cut. They discussed scheduling an MRI. The
 
 *592
 
 MRI showed a
 
 *554
 
 "very complicated" tumor with nerves surrounding it. Following the MRI, Dr. Duberman referred Plaintiff to a specialist at UNC-Chapel Hill. Plaintiff went to see a doctor at UNC but did not remember any further details.
 

 Plaintiff sought a second opinion at Duke. After seeing multiple doctors from multiple specialties, they told her she had nerve damage resulting from surgery. Due to the complicated nature of the tumor, doctors at Duke refused to perform surgery on Plaintiff to remove the remainder of the tumor.
 

 Plaintiff next went to Houston, Texas to seek treatment from Dr. Jimmy F. Howell, M.D. He successfully removed the remainder of the tumor. Following the surgery in Texas, Dr. Howell told Plaintiff one of her nerves had previously been cut.
 

 At the time of the deposition, Plaintiff took prescription medications for anxiety, depression, and thyroid problems as well as ibuprofen daily for pain relief. Prior to the surgeries, Plaintiff worked five days a week for eight to nine hours per day teaching the Dari language to special forces units deploying to Afghanistan. In June 2012, when her contract ended, she did not actively seek to renew her contract or seek another job because of her hand. She explained teaching requires writing on the blackboard and typing, things she is no longer able to do. Now, Plaintiff collects Social Security disability in the amount of $1,700.00 per month. She explained the pain and loss of use of her hand also caused her to discontinue cooking, gardening, and exercising. It also affected her relationship with her husband, and she began to sleep in a different room because the pain caused her to toss and turn in her sleep. Since the second surgery, Plaintiff's depression worsened.
 

 B. Mahamoud Seraj Deposition
 

 Plaintiff's husband, Mahamoud Seraj ("Mahamoud"), gave a deposition on 9 April 2014. He was born in Afghanistan, and moved to France during high school. As a design engineer, he moved to California and later to Apex, North Carolina. He and Plaintiff married in 1994. Together, they have one daughter and both Plaintiff and her husband have one child each from previous marriages.
 

 Mahamoud estimated Plaintiff went to the doctor approximately two or three weeks after she showed him the lump on her arm. When Plaintiff returned from seeing Dr. Newman for the first time, Plaintiff told him the lump was "fatty tissue." Dr. Newman sent Plaintiff to a
 
 *593
 
 surgeon, Dr. Duberman. Regarding the first surgery using local anesthesia, Mahamoud said, "She just said it was very painful, and Dr. Duberman said, 'We have to do that under general anesthesia because,' from his opinion, [the lump] was deeper than what he was thinking." Following the first surgery, his wife did not experience continuing pain.
 

 Following the second surgery, "Dr. Duberman told her the tumor was very deep. He couldn't extract it. All he could do is stop [the] bleeding." Immediately after the surgery, she complained of "pulsing" in her fingers, with no feeling in two fingers. The weekend after the surgery, she described pain, numbness, pulsing, and burning in her hand. Mahamoud remembers Plaintiff calling Dr. Duberman two times after the surgery. She also had problems holding things.
 

 Mahamoud accompanied Plaintiff to doctors' appointments at UNC and Duke following the second surgery. A doctor at UNC "said that it's very risky to do surgery on this, and they said that, from the symptoms that they are seeing, some nerves are cut." The doctors at Duke were "shocked" Dr. Duberman did not have an MRI taken before the first surgery. The doctors at Duke diagnosed Plaintiff as having a Masson's tumor. It is a rare, benign tumor which would be risky to remove. As Mahamoud understood it, the tumor was "tangled around nerves" and it was touching an artery.
 

 Following the second surgery, Plaintiff had approximately one week remaining on her contract to teach the Dari language to special forces troops and had to administer their final exam. Due to her arm, Plaintiff was unable to drive. Mahamoud drove Plaintiff to class every day that week, and stayed in the classroom with her during class. Plaintiff no longer teaches, in part because she cannot drive and Mahamoud cannot miss work to drive her to work every day. Since
 
 *555
 
 Plaintiff lost the full use of her right hand, Mahamoud explained, she's been suffering from anxiety and depression. She takes multiple medications, which have helped, but they make her act "like a zombie."
 

 C. Dr. Duberman Deposition
 

 Dr. Duberman gave a deposition on 11 March 2014. Dr. Duberman attended undergraduate and medical school at Columbia University. He completed his residency at Tufts New England Medical Center. He also completed a fellowship in colon and rectal surgery at the Robert Wood Johnson School of Medicine. Currently, Dr. Duberman is an employee and an owner of Western Wake Surgical. He performs both general and colon and rectal surgeries.
 

 *594
 
 Dr. Duberman operated on approximately 100 upper extremity masses prior to Plaintiff's surgery. About 80 percent of those were lipomas. Generally, he could tell whether a mass was a lipoma or something else based on the texture and feel of the mass. He did not generally perform an MRI before operating on an upper extremity mass.
 

 Discussing Plaintiff, Dr. Duberman recalled "her presenting to the office with this soft tissue mass in her arm. And I remember examining her arm. It was mobile, non-tender, soft-soft tissue mass. And I recall asking her if she wanted it removed and her stating that she would like it removed." Prior to Plaintiff's first surgery, Dr. Duberman did not perform or order an MRI on Plaintiff because he does not believe imaging is needed for "soft tissue masses." Based on his physical examination of Plaintiff, he diagnosed her with a lipoma. During Plaintiff's first visit to Dr. Duberman's office, he identified the lump on her right arm as a lipoma. He was concerned about the rapid enlargement of the mass, but still believed the mass to be a lipoma.
 

 During the first procedure, performed at WakeMed Cary Hospital, he remembered using local anesthesia and Plaintiff being uncomfortable during the procedure. The mass was completely within Plaintiff's muscle. When he made the incision, he could only see muscle, with the tumor bulging from within the muscle. He could not see the tumor itself during the first surgery, only the muscle surrounding the tumor. Following the first surgery on 11 November 2011, Dr. Duberman still believed the mass to be a lipoma.
 

 During the second surgery, Dr. Duberman opened the previous incision. He opened the fascia of the muscle and spread the muscles cross-wise. At this time, "copious bleeding ensued." Dr. Duberman applied pressure to the area with a sponge for approximately five minutes. After controlling the bleeding, he continued to dissect into the muscle. He noted seeing a superficial nerve. Below the surface of the muscle belly, he saw a "vascular mass." He identified it as a vascular mass because it was bleeding. Dr. Duberman then conducted a biopsy from the surface of the mass. Then, he closed the incision layer by layer. He then scheduled a follow-up MRI and referred her to a surgical oncologist, Dr. Doug Tyler at Duke.
 

 During the two surgeries on Plaintiff, Dr. Duberman did not see the median nerve, a large nerve in the arm. He also did not notice any neural dysfunction following the second surgery. He did not conduct a neurological examination because it was not his practice to do so on patients with soft tissue tumors. He explained the median nerve is a visible structure, and "had it been encountered it would've been protected."
 

 *595
 
 The biopsy identified Plaintiff's tumor as a Masson's tumor. Before Plaintiff's surgery, Dr. Duberman had never heard of a Masson's tumor.
 

 D. Dr. Williamson Deposition
 

 Dr. Barry Williamson, an expert witness for Plaintiff and a board certified general surgeon, also gave a deposition on 30 May 2014. In Dr. Williamson's professional opinion, Dr. Duberman should have ordered diagnostic tests following the first surgery when he did not find what he expected to find. He should not have conducted the second operation without performing tests first. "The patient should have been worked up fully for what this mass was. Seeing that it encompassed the artery and the nerve, [she] should have been worked up completely for any kind of neurologic dysfunction prior to surgery."
 

 *556
 
 During the second surgery, Dr. Duberman "injured the median nerve." Dr. Williamson found no evidence Dr. Duberman had cut the nerve, only evidence the nerve was damaged.
 

 Q: [D]o you have an opinion as to the mechanism of that injury? Did he-was it a direct injury? Was it a compression injury ?
 

 A: I don't know. I mean, based on his operative note, there's no way to tell....
 

 Q: Do you have an opinion as to whether that tumor could have been removed without damage to the median nerve?
 

 A: I don't know that. That's not my area of expertise.
 

 Q: Do you know whether if the tumor had just been left alone and no further surgery took place at all whether there would have been any injury to the median nerve.
 

 A: Impossible to know. Again, Masson's tumors are fairly rare, so I don't know that anybody has a lot of experience with leaving those behind and seeing what happens....
 

 Q: Tell me about your-you said you had reviewed the deposition of Dr. Duberman. Tell me, was there anything in his testimony that you disagreed with?
 

 A: No. No. Again, you know, like I said, the first surgery that he did, I don't have a problem with. We see people here in the office all the time and take lumps and bumps off, and 95 percent of the time or more you come back with exactly what you think. But occasionally, you find
 
 *596
 
 something that you're not expecting. And the decision then is do you proceed with that or do you stop and do further workup. And I think that's where the problem came in, is he stopped, but he didn't do any further workup to see why he didn't find what he expected....
 

 Q: Dr. Williamson, more likely than not, to a reasonable degree of medical probability, did Dr. Duberman's negligence cause [Plaintiff's] injury and the sequelae thereof?
 

 A: Yes.
 

 Q: Dr. Williamson, more likely than not, to a reasonable degree of medical probability, had Dr. Duberman treated [Plaintiff] within the standards of care, would she have experienced median nerve damage and the sequelae thereof?
 

 A: No.
 

 He continued by explaining the standard of care of surgeons in Cary would require testing following the first surgery.
 

 E. Dr. Brigman Deposition
 

 Finally, Defendants attached the deposition of Dr. Brian Brigman to their motion for summary judgment. A physician in the field of orthopedic oncology, Dr. Brigman is employed at Duke University Medical Center and is certified in orthopedic surgery. He is also a member of the Vascular Malformation Team at Duke, a multi-disciplinary team. Plaintiff came to see Dr. Brigman because of a mass in her arm. Dr. Tyler, another physician at Duke University Medical Center, referred Plaintiff to Dr. Brigman.
 

 Dr. Brigman examined Plaintiff and noted she had the symptoms of a median nerve injury, including numbness and weakness. Potential causes of the nerve injury included compression from the mass, a traction injury from the surgery, the nerve losing blood supply, or a direct injury from cutting the nerve. At that time, Dr. Brigman recommended scheduling another MRI, and suggested surgery may be an option.
 

 Plaintiff returned approximately six weeks later for a second appointment. At that time, Plaintiff complained she was stressed and losing weight due to the tumor. At the conclusion of the second assessment, Dr. Brigman wrote in his notes: "There is likely injury to her median nerve, however it is unclear whether it's from the previous surgical intervention or if it may be related to compression of the malformation on the
 
 *597
 
 median nerve itself." Dr. Brigman scheduled a surgery during Plaintiff's second visit, but Plaintiff later cancelled the appointment.
 

 On 27 October 2014, Plaintiff filed a cross-motion for summary judgment. Plaintiff argued there was no genuine issue of material fact as to Dr. Duberman's liability for medical negligence, Plaintiff's claim of respondeat superior against Western Wake Surgical, and
 
 *557
 
 the affirmative defense of contributory negligence. Attached to the motion, Plaintiff provided affidavits of Plaintiff and Dr. Williamson.
 

 Plaintiff's affidavit stated Dr. Duberman performed a surgery on Plaintiff's arm on 11 November 2011. Before the first surgery, he did not order an MRI or other imaging of her arm. The second surgery occurred 13 April 2012. Before the second surgery, Dr. Duberman did not tell Plaintiff she needed an MRI.
 

 Dr. Williamson's affidavit stated he is a licensed physician in the field of general surgery. Dr. Duberman should have ordered an MRI prior to the second surgery on plaintiff. "Without ordering these, Dr. Duberman could not be certain what type of mass he was operating on." As a general surgeon, Dr. Duberman is not qualified to operate on a Masson's tumor.
 

 On 13 January 2015, the trial court entered an order granting Plaintiff's motion for summary judgment on Plaintiff's respondeat superior claim. The trial court also granted Defendant's motion for summary judgment, noting, "[T]he Plaintiff has failed to offer sufficient evidence establishing the necessary element of proximate causation." The trial court denied Plaintiff's motion for summary judgment as it relates to contributory negligence and determined Plaintiff's constitutional claims related to the economic damages cap were not ripe for consideration. Plaintiff timely filed a notice of appeal.
 

 II. Jurisdiction
 

 As an appeal from a final judgment of a superior court, jurisdiction lies in this Court pursuant to N.C. Gen.Stat. § 7A-27(b) (2015).
 

 III. Standard of Review
 

 An order granting summary judgment is reviewed
 
 de novo.
 

 N.C. State Bar v. Scott,
 
 --- N.C.App. ----, ----,
 
 773 S.E.2d 520
 
 , 522 (2015),
 
 appeal dismissed and disc. review denied,
 

 368 N.C. 682
 
 ,
 
 781 S.E.2d 621
 
 (2016). Summary judgment is appropriate only when there is no genuine issue of material fact and any party is entitled to judgment as a matter of law.
 
 In re Will of Jones,
 

 362 N.C. 569
 
 , 573,
 
 669 S.E.2d 572
 
 , 576 (2008).
 

 *598
 
 Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen.Stat. § 1A-1, Rule 56(c) (2015). When reviewing the evidence on a motion for summary judgment, we review evidence presented in the light most favorable to the non-moving party.
 
 Summey v. Barker,
 

 357 N.C. 492
 
 , 496,
 
 586 S.E.2d 247
 
 , 249 (2003).
 

 IV. Analysis
 

 To bring a medical malpractice action, the plaintiff bears the burden of establishing " '(1) the applicable standard of care; (2) a breach of such standard of care by the defendant; (3) the injuries suffered by the plaintiff were proximately caused by such breach; and (4) the damages resulting to the plaintiff.' "
 
 Purvis v. Moses H. Cone Memorial Hosp. Service Corp.,
 

 175 N.C.App. 474
 
 , 477,
 
 624 S.E.2d 380
 
 , 383 (2006) (quoting
 
 Weatherford v. Glassman,
 

 129 N.C.App. 618
 
 , 621,
 
 500 S.E.2d 466
 
 , 468 (1998) ). An actor's negligence is the proximate cause of harm to another if "(a) his conduct is a substantial factor in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm." Restatement (Second) of Torts § 431 (2016). The North Carolina Supreme Court defines proximate cause as follows:
 

 [A] cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.
 

 Hairston v. Alexander Tank & Equip. Co.,
 

 310 N.C. 227
 
 , 233,
 
 311 S.E.2d 559
 
 , 565 (1984) (citations omitted). A court should determine whether the evidence presents an issue where a "jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm
 
 *558
 
 to the plaintiff[.]" Restatement (Second) of Torts § 434 (2016). It is then a question for the jury whether the defendant's conduct was a substantial factor in causing harm to the plaintiff.
 

 Id.
 

 To forecast evidence of proximate causation in a medical malpractice action, expert testimony is needed.
 
 Cousart v. Charlotte-Mecklenburg Hos. Auth.,
 

 209 N.C.App. 299
 
 , 303,
 
 704 S.E.2d 540
 
 , 543 (2011).
 

 *599
 
 Due to the complexities of medical science, particularly with respect to diagnosis, methodology and determinations of causation, this Court has held that where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury. However, when such expert opinion testimony is based merely upon speculation and conjecture, it can be of no more value than that of a layman's opinion. As such, it is not sufficiently reliable to qualify as competent evidence on issues of medical causation. Indeed, this Court has specifically held that an expert is not competent to testify as to a causal relation which rests upon mere speculation or possibility.
 

 Young v. Hickory Bus. Furniture,
 

 353 N.C. 227
 
 , 230,
 
 538 S.E.2d 912
 
 , 915 (2000) (internal citation and quotations marks omitted).
 

 To survive a motion for summary judgment in a medical malpractice action, the plaintiff must "forecast evidence demonstrating that the treatment administered by [the] defendant was in negligent violation of the accepted standard of medical care in the community[,] and that [the] defendant's treatment proximately caused the injury."
 
 Lord v. Beerman,
 

 191 N.C.App. 290
 
 , 293-294,
 
 664 S.E.2d 331
 
 , 334 (2008) (internal citations and quotation marks omitted). "Our Court's prior decisions demonstrate that where a plaintiff alleges that he or she was injured due to a physician's negligent failure to diagnose or treat the plaintiff's medical condition sooner, the plaintiff must present at least some evidence of a causal connection between the defendant's failure to intervene and the plaintiff's inability to achieve a better ultimate medical outcome."
 
 Id.
 
 at 294,
 
 664 S.E.2d at 334
 
 .
 

 In
 
 Turner v. Duke Univ.,
 

 325 N.C. 152
 
 , 155-56,
 
 381 S.E.2d 706
 
 , 708-09 (1989), for example, Duke University Medical Center admitted decedent to the hospital for constipation, cramping, nausea, and vomiting.
 

 Id.
 

 Defendant, a physician, treated her for constipation, unable to determine the cause of plaintiff's symptoms.
 

 Id.
 

 Decedent's condition worsened, but doctors failed to examine her for a number of hours, during which time she became unresponsive.
 
 Id.
 
 at 156,
 
 381 S.E.2d at 709
 
 . Surgery revealed decedent's colon was perforated, and she died of an infection the following day.
 
 Id.
 
 at 156-57,
 
 381 S.E.2d at 709
 
 . Plaintiff's expert testified that the defendant should have examined decedent sooner, and his failure to conduct an earlier examination proximately
 
 *600
 
 caused her death.
 
 Id.
 
 at 159-60,
 
 381 S.E.2d at 711
 
 . Had the physician discovered decedent's perforated colon sooner, plaintiff's expert testified, decedent's life could have been saved.
 
 Id.
 
 at 160,
 
 381 S.E.2d at 711
 
 . "Such evidence is the essence of proximate cause."
 

 Id.
 

 The Court held a question of fact existed as to whether decedent's death was caused by defendant's negligent failure to diagnose decedent's condition.
 

 Id.
 

 Defendants assert the threshold needed to surmount summary judgment and proceed to a jury on the issue of proximate cause is that plaintiff
 
 probably
 
 would have been better off if not for defendant's negligence.
 
 See
 

 Lord,
 

 191 N.C.App. at 300
 
 ,
 
 664 S.E.2d at 338
 
 . Defendants further contend experts must establish " '[t]he connection or causation between [Defendant's alleged] negligence and [Plaintiff's injury was]
 
 probable,
 
 not merely a remote possibility.' "
 

 Id.
 

 (quoting
 
 White v. Hunsinger,
 

 88 N.C.App. 382
 
 , 387,
 
 363 S.E.2d 203
 
 , 206 (1988) ) (emphasis in original).
 

 However, the rule that proximate causation requires a showing plaintiff probably would have been better off is not applicable in this case. The rule applies when there is a negligent delay in treatment or diagnosis.
 
 See
 

 id.
 

 at 296-300
 
 ,
 
 664 S.E.2d at 336-38
 
 . As explained in
 
 Katy v. Capriola,
 

 226 N.C.App. 470
 
 , 481,
 
 742 S.E.2d 247
 
 , 255 (2013), the rule
 
 *559
 
 is part of a special jury instruction when the question for the jury to consider is whether the injury is proximately caused by the delay in treatment or diagnosis.
 
 See Id.; see also
 
 N.C.P.I., Civ. 809.00A (gen. civ. vol. 2014).
 

 Defendants argue
 
 Campbell v. Duke Univ. Health Sys., Inc.,
 

 203 N.C.App. 37
 
 , 45,
 
 691 S.E.2d 31
 
 , 36 (2010), prevents "mere speculation" to establish proximate cause. In
 
 Campbell,
 
 the plaintiff underwent surgery on his right shoulder.
 

 Id.
 

 at 38
 
 ,
 
 691 S.E.2d at 33
 
 . One hour after the surgery, plaintiff began to experience pain in his left arm.
 

 Id.
 

 at 39
 
 ,
 
 691 S.E.2d at 33
 
 . Plaintiff did not assert the doctrine of
 
 res ipsa loquitur.
 

 Id.
 

 at 40
 
 ,
 
 691 S.E.2d at 34
 
 . We distinguish
 
 Campbell
 
 from this case on its facts. In
 
 Campbell,
 
 plaintiff's injury was outside the scope of the surgery whereas here the injury occurred within the scope of the surgery.
 

 Here, Plaintiff argues Dr. Duberman's failure to perform testing prior to the second surgery proximately caused her injuries. Had he ordered an MRI or other imaging of the lump, she asserts he would have discovered the mass was not a lipoma and he would not have operated a second time. Not ordering imaging after the first attempted surgery violated the standard of care. The evidence is sufficient to raise a factual issue of whether this violation of the standard of care proximately caused Plaintiff's injuries. Plaintiff emphasizes Dr. Williamson's testimony that it is more likely than not that had Dr. Duberman followed the standard of care, she would
 
 *601
 
 not have experienced nerve damage. Viewing the evidence in the light most favorable to Plaintiff, the non-moving party, Plaintiff contends she presented evidence sufficient to disprove Defendants' claim that no question of material fact exists. We agree.
 

 Plaintiff met her burden to establish Dr. Duberman's failure to perform testing prior to the second surgery was in negligent violation of the accepted standard of medical care in the community. The question before us is whether Dr. Duberman presented sufficient evidence that failure to perform testing prior to the second surgery proximately caused Plaintiff's injury.
 

 Dr. Brigman's expert testimony, which is necessary to forecast evidence of proximate causation in a medical malpractice action, established Dr. Duberman should not have conducted the second surgery on Plaintiff. Dr. Duberman, as a general surgeon, is not qualified to operate on a Masson's tumor. "Without ordering [tests], Dr. Duberman could not be certain what type of mass he was operating on." Had Dr. Duberman ordered the MRI, he would have identified the mass as something other than a lipoma, and would not have conducted the operation. Dr. Williamson agreed Dr. Duberman should not have performed the second surgery without conducting testing first. Dr. Williamson stated: "The patient should have been worked up fully for what this mass was. Seeing that it encompassed the artery and the nerve, [she] should have been worked up completely for any kind of neurologic dysfunction prior to surgery."
 

 Viewed in the light most favorable to Plaintiff, the evidence presents disputed issues of fact so a "jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to [P]laintiff."
 
 See
 
 Restatement (Second) of Torts § 434. Plaintiff experienced numbness and pain in her fingers and hand following the second surgery. There is no evidence she experienced any numbness or pain in her hand prior to the surgery. According to Dr. Williamson, the tumor Dr. Duberman attempted to remove "encompassed the artery and the nerve." In his professional opinion, Dr. Williamson said Dr. Duberman "injured the median nerve." Although Dr. Williamson did not testify conclusively as to whether Dr. Duberman cut the nerve, his testimony sufficiently established Dr. Duberman injured Plaintiff's nerve. We therefore hold the evidence, when viewed in the light most favorable to the non-moving party, shows a genuine issue of material fact exists.
 

 We recognize that Defendants' expert disputes Plaintiff's evidence of proximate causation and posits differing possibilities explaining the results obtained in this medical procedure. These differences are jury
 
 *602
 
 matters going to the weight and credibility of
 
 *560
 
 the witnesses or which of several events was more likely than not to be a proximate cause of the injury. Summary judgment is inappropriate where such factual debates are raised by the evidence and experts differ.
 

 V. Conclusion
 

 For the foregoing reasons, we reverse the trial court's summary judgment order.
 

 REVERSED.
 

 Judges STEPHENS and INMAN concur.