**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1015

DARRELL A. CONNOR, Individually and as Executor of the Estate of Charles
Franklin Connor, Deceased,

Plaintiff - Appellant,

v.

COVIL CORPORATION,

Defendant - Appellee,

and

NORFOLK SOUTHERN RAILWAY COMPANY; AIR & LIQUID SYSTEMS
CORPORATION, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO
BUFFALO PUMPS; BW/IP, INC., INDIVIDUALLY AND AS SUCCESSOR TO
BYRON JACKSON PUMPS; CARRIER CORPORATION; CBS
CORPORATION, agent of VIACOM, INC., SUED AS SUCCESSOR-BY-
MERGER TO CBS F/K/A WESTINGHOUSE ELECTRIC CORPORATION;
CRANE CO; DANA COMPANIES, LLC, SUCCESSOR-BY-MERGER TO
WARNER BRAKE AND CLUTCH COMPANY, INC; FISHER CONTROLS
INTERNATIONAL LLC, WHOLLY OWNED SUBSIDIARY OF EMERSON
ELECTRIC COMPANY; FLOWSERVE US, INC., individually and as successor
to BYRON JACKSON PUMP COMPANY; FLUOR CONSTRUCTORS
INTERNATIONAL, f/k/a Fluor Corporation; FLUOR CONSTRUCTORS
INTERNATIONAL, INCORPORATED; FLUOR DANIEL SERVICES
CORPORATION; FLUOR ENTERPRISES, INC.; GENERAL ELECTRIC
COMPANY; GOULDS PUMPS, INCORPORATED; METROPOLITAN LIFE
INSURANCE COMPANY; MINE SAFETY APPLICANCES COMPANY, LLC;
PNEUMO ABEX, LLC, SUCCESSOR IN INTEREST TO ABEX
CORPORATION; SPX COOLING TECHNOLOGIES, INC., individually and
successor in interest to MARLEY COOLING TOWERS CO.; THE DOW
CHEMICAL COMPANY; WARNER ELECTRIC LLC,

Defendants.

_____

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Loretta C. Biggs, District Judge.  (1:17-cv-00127-LCB-JLW)

_____

Argued:  March 9, 2021                                    Decided:  April 27, 2021

_____

Before DIAZ, THACKER, and HARRIS, Circuit Judges.

_____

Affirmed by published opinion.  Judge Thacker wrote the opinion, in which Judge Diaz and Judge Harris joined.

_____

**ARGUED:**  Lisa White Shirley, DEAN OMAR BRANHAM SHIRLEY, LLP, Dallas, Texas, for Appellant.  Elbert Lin, HUNTON ANDREWS KURTH, LLP, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Benjamin D. Braly, DEAN OMAR BRANHAM SHIRLEY, LLP, Dallas, Texas; William M. Graham, WALLACE & GRAHAM, P.A., Salisbury, North Carolina, for Appellant.  Leslie C. Packer, Raleigh, North Carolina, Curtis J. Shipley, ELLIS & WINTERS LLP, Greensboro, North Carolina; Katy Boatman, HUNTON ANDREWS KURTH LLP, Houston, Texas, for Appellee.

_____

THACKER, Circuit Judge:

On June 11, 2017, Charles F. Connor ("Mr. Connor") died at the age of 90 of mesothelioma, an aggressive form of cancer that is caused by the inhalation of asbestos fibers. Following Mr. Connor's death, his son, Darrell Connor ("Appellant"), individually and as executor of Mr. Connor's estate, brought a wrongful death action. Appellant named 22 defendants and stated a plethora of causes of action arising under both federal and North Carolina law.[1] All of Appellant's claims boil down to one straightforward accusation: that the defendants wrongfully caused Mr. Connor to become exposed to asbestos and develop his fatal mesothelioma cancer.

This appeal involves only one of the 22 named defendants: Covil Corporation ("Appellee"), a manufacturer and supplier of asbestos insulation. Appellant alleges that Mr. Connor was exposed to Appellee's asbestos products during his time as an employee at Fiber Industries, a polyester production company whose facility contained piping that was wrapped in Appellee-supplied asbestos.

The district court granted summary judgment in favor of Appellee, finding, as a matter of law, that Appellant failed to demonstrate that Mr. Connor was sufficiently

---

[1] We have subject matter jurisdiction over this case based on diversity of citizenship. "A federal court sitting in diversity is required to apply the substantive law of the forum state, including its choice-of-law rules." *Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013). Here, the forum state is North Carolina. "In tort actions, North Carolina courts adhere to the rule of lex loci and apply the substantive laws of the state in which the injuries were sustained." *Johnson v. Holiday Inn of Am., Inc.*, 895 F. Supp. 97, 98 (M.D.N.C. 1995) (citing *Charnock v. Taylor*, 26 S.E.2d 911, 913 (N.C. 1943)). As both parties to this appeal recognize, under that rule, North Carolina law governs Appellant's state law claims.

exposed to Appellee's asbestos to create a genuine dispute regarding causation. For the reasons that follow, we affirm.

I.

A.

Before Mr. Connor worked for Fiber Industries, the vast majority of his employment history was as a machinist mechanic for the Norfolk Southern Railway Company ("Norfolk Southern").[2] Mr. Connor worked at Norfolk Southern for 18 years, from 1943 to 1944 and 1946 to 1963. For at least seven of these years, Norfolk Southern's trains were powered by steam engines. One of Mr. Connor's primary job responsibilities during this timeframe was performing maintenance on the steam engines, which required him to spend considerable amounts of time "either beside the engine[s] or in [a] pit" directly underneath them. J.A. 238.[3]

According to Mr. Connor's deposition testimony, Norfolk Southern's steam engines had "[b]oilers wrapped in asbestos"[4] that needed to be removed and replaced on a "daily basis." J.A. 236, 238–43. Though it does not appear that Mr. Connor worked with the steam engines' asbestos insulation directly, the process of removing and replacing the

---

[2] Norfolk Southern was named as a defendant in the amended complaint but was dismissed from the case in January 2019 after reaching a settlement with Appellant.

[3] Citations to the "J.A." refer to the corrected Joint Appendix filed by the parties in this appeal.

[4] Of note, Appellant does not allege that Appellee supplied asbestos products to Norfolk Southern.

insulation caused asbestos dust to collect in the places where Mr. Connor worked -- i.e., next to the steam engines and in the pits beneath them. Indeed, Mr. Connor testified that while working at Norfolk Southern, so much asbestos dust piled up on his clothes that he regularly had to blow himself off with compressed air. And despite utilizing the compressed air, Mr. Connor recalled returning "home sometimes . . . [w]ith [his] clothes having the dust and everything on them." *Id.* at 239. When asked at his deposition, "Where is it that you would have been exposed to asbestos during your working life?" Mr. Connor responded, "The time I worked for the railroad." *Id.* at 229.

After spending nearly two decades at Norfolk Southern, Mr. Connor then worked in a management position at Fiber Industries from 1966 until his retirement in 1982. Fiber Industries is a manufacturing company that specializes in the production of polyester fibers. During Mr. Connor's employment at Fiber Industries, the company was based out of a roughly 20-acre facility in Salisbury, North Carolina that was built by the Daniel International Corporation ("Daniel International"). The facility was comprised of a massive production plant and several smaller buildings. After construction of the facility was complete, Daniel International workers remained present at the facility to serve as "on-site maintenance personnel." J.A. 824.

A considerable amount of piping ran through the Fiber Industries facility, particularly in the production plant. According to the testimony of several former employees of Fiber Industries and Daniel International, these pipes were wrapped in asbestos insulation that was routinely removed and replaced by Daniel International workers until at least 1975. *See* J.A. 737–39 (Jerry Hicks, a former insulation foreman for

5

Daniel International, testifying that Daniel International ceased buying asbestos-based insulation in 1973, but continued to use the asbestos products they had already purchased until 1975). Appellee was made a defendant in this case because it sold Daniel International the asbestos products that the company used to insulate the piping at the Fiber Industries facility.

Like the insulation maintenance process at Norfolk Southern, the process of Daniel International workers removing and replacing the asbestos insulation that cloaked the piping at the Fiber Industries production plant generated asbestos dust that collected on the floor and floated in the air. *See* J.A. 380 (Troy Witherspoon, a former Fiber Industries employee, testifying that, "[a]t times," the "removal and installation of . . . insulating material" was "very dusty"); *id.* at 743 (Hicks testifying that Daniel International's work with asbestos insulation produced "airborne dust").

For all but a few months of his tenure at Fiber Industries, Mr. Connor served as a supervisor in charge of employee training and development. In this role, his primary job responsibilities included supervising the "training operators that worked under him" and developing "lesson plans" that were used to train new employees. J.A. 522. Mr. Connor had an office in the facility's "P building," an office building located roughly 200 feet from the production plant. Notably, Mr. Connor testified that there was no asbestos in the P building, and Appellant does not contend otherwise. More notably still, at oral argument, counsel for Appellant was asked whether Mr. Connor spent most of his time at Fiber Industries "in the P building, which didn't have asbestos." Counsel replied, "That's right." Oral Argument at 39:03–09, *Connor v. Covil Corp.*, No. 19-1015 (4th Cir. Mar. 9, 2021),

6

https://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments (hereinafter "Oral Argument"). However, the parties dispute how much time Mr. Connor actually spent in his office in the P building, versus how much time he spent visiting the production plant, where Daniel International workers might have been working with Appellee-supplied asbestos insulation. The parties likewise dispute how frequently Mr. Connor's trips to the production plant brought him into contact with Daniel International workers and whether these encounters could have exposed Mr. Connor to Appellee's asbestos products.

B.

Appellant filed the amended complaint -- which is the operative complaint in this case[5] -- on September 19, 2017. The amended complaint asserts five causes of action against Appellee, all of which arise under North Carolina state law: (1) defective design; (2) breach of implied warranty; (3) gross negligence; (4) failure to warn; and (5) premises liability. All five claims stem from Mr. Connor's alleged exposure to Appellee's asbestos insulation products while they were being used or maintained by Daniel International workers at the Fiber Industries facility.

On July 13, 2018, Appellee moved for summary judgment, arguing that Appellant's evidence failed to create a genuine dispute of fact regarding whether Mr. Connor was sufficiently exposed to Appellee's asbestos-containing products. The district court granted

---

[5] Appellant filed the original complaint on February 15, 2017. He filed the amended complaint to reflect the death of Mr. Connor and name himself as the sole executor of Mr. Connor's estate.

Appellee's motion. It held that the record "evidence, viewed in the light most favorable to" Appellant, "is insufficient to support an inference that Mr. Connor's harm was caused by asbestos insulation supplied by [Appellee]." J.A. 2347.[6]

Appellant filed a notice of appeal on January 3, 2019. As set forth in detail below, we agree with the district court's conclusion that Appellant's evidence does not permit a reasonable inference that Mr. Connor was sufficiently exposed to Appellee's asbestos products.

## II.

We review a district court's grant of summary judgment de novo. *See Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When assessing a motion for summary judgment, the court views "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

---

[6] In addition to moving for summary judgment, Appellee filed a motion in limine to prevent Appellant's proposed expert witnesses from testifying regarding the amount of asbestos to which one must be exposed in order to contract mesothelioma. Appellee claimed that Appellant's proposed experts' opinions should be excluded because they are based on a scientific theory that does not pass muster under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The district court denied this motion as moot after granting Appellee's motion for summary judgment. Because we resolve the appeal at the summary judgment stage, we likewise decline to address the *Daubert* issue.

III.

A.

<u>Causation Law in North Carolina Asbestos Cases</u>

In tort cases governed by North Carolina law, the plaintiff must prove that the defendant's alleged misconduct "was a substantial factor causing the plaintiff's injury." *Finch v. Covil Corp.*, 972 F.3d 507, 512 (4th Cir. 2020) (applying North Carolina law). To satisfy the requirement of substantial factor causation in asbestos cases, the plaintiff "must demonstrate that he [or the decedent] was actually exposed to the alleged offending products." *Wilder v. Amatex Corp.*, 336 S.E.2d 66, 68 (N.C. 1985). And, we have made clear that proving "more than . . . casual or minimum" exposure to the defendant's asbestos products is necessary. *Jones v. Owens-Corning Fiberglas Corp.*, 69 F.3d 712, 716 (4th Cir. 1995) (affirming the district court's grant of summary judgment to the plaintiffs on the issue of exposure in an asbestos case governed by North Carolina law). To survive summary judgment on the issue of substantial factor causation, the plaintiff must introduce "evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162–63 (4th Cir. 1986).[7] This test is referred to as the "frequency, regularity, and proximity" test.

---

[7] Although *Lohrmann* was a case governed by Maryland, not North Carolina, law, we have readily applied the frequency, regularity, and proximity test when assessing substantial factor causation in asbestos cases governed by North Carolina law, as there is

9

B.

Application of the Frequency, Regularity, and Proximity Test

Here, Appellant has not introduced any direct evidence that demonstrates that Mr. Connor was exposed to Appellee's asbestos insulation products. Instead, Appellant contends that it is reasonable to infer that Mr. Connor was sufficiently exposed to Appellee's asbestos. Appellant's argument supporting this inference proceeds as follows: during Mr. Connor's time as a Fiber Industries employee, he allegedly had interactions with, and was only a few feet away from, Daniel International workers on a regular basis. Since Daniel International workers routinely performed maintenance on Appellee's asbestos insulation in a way that generated asbestos dust, Mr. Connor must have been exposed to Appellee's asbestos.

To be sure, the absence of direct evidence is not in itself fatal to Appellant's case, as "a reasonable inference of substantial causation" can be supported by circumstantial evidence alone. *Lohrmann*, 782 F.2d at 1162. However, our view of the record here is that Appellant's circumstantial causation evidence does not pass muster under the frequency, regularity, and proximity test. The evidence simply does not support Appellant's contention that Mr. Connor's interactions with Daniel International workers outside of the P building inevitably led to his exposure to Appellee's asbestos. As a result, we hold that Appellee is entitled to judgment as a matter of law on all of Appellant's claims.

---

"nothing to indicate that *Lohrmann* conflicts with North Carolina law in this regard." *Jones*, 69 F.3d at 716 n.2. The parties in this appeal agree that *Lohrmann* guides our assessment of Appellant's causation evidence.

1.

Frequency and Regularity

We begin our analysis of the frequency and regularity prongs by evaluating how often Mr. Connor left his office in the asbestos-free P building to visit the production plant, where Daniel International employees might have been working with Appellee's asbestos products. Importantly, the fact that there is conflicting evidence on the specific issue as to how often Mr. Connor left his office in the P building to visit the production plant does not compel us to reverse the district court's grant of summary judgment in favor of Appellee. As discussed *infra*, even if we assume that Mr. Connor regularly visited the production plant during his time as a Fiber Industries employee, there is insufficient evidence of Mr. Connor coming into frequent, regular, and close-proximity contact with Daniel International workers who were using Appellee's asbestos products to create a genuine dispute of fact regarding substantial factor causation.

On the one hand, Mr. Connor testified that he "worked most [of] the time in the training department" located in the P building, which he described as "just as clean as your home." J.A. 322, 351. Mr. Connor stated that he would "make a pass" through the production plant if he "got through with [his] paperwork," but he made clear that these trips to the production plant did not occur every day. *Id.* at 264, 323. On the other hand, Mr. Connor also testified that he "only stayed in [his] office when [he] had a lot of paperwork to do." *Id.* at 264. Witherspoon, a longtime coworker of Mr. Connor's at Fiber Industries, similarly testified, "It would have been impossible for [Mr. Connor] to do his job without being out in the [production plant] area." *Id.* at 388. While Witherspoon's

11

"estimate" was that Mr. Connor made a pass through the production plant every day, *id.* at 376 ("I would dare say that [Mr. Connor] was in the -- in one of the areas every day, somewhere in the plant."), this estimation conflicts with Mr. Connor's own testimony on the frequency of his visits to the production plant.

Because Appellant's causation argument hinges on Mr. Connor being exposed to Appellee's asbestos while it was being used by Daniel International workers, we must also evaluate how often Mr. Connor's "passes" through the production plant brought him into contact with these workers. The record does not provide a good sense of how frequently this sort of run-in occurred. Mr. Connor testified that he knew Daniel International workers were present in the Fiber Industries facility and even recalled seeing them "several times a day." J.A. 326. But Mr. Connor seeing Daniel International workers several times a day is not in itself significant to our causation analysis -- what matters is whether the Daniel International workers were using Appellee's asbestos products on these occasions. And considering that Mr. Connor testified that he often spent entire workdays without leaving the asbestos-free P building, it is likely that many, if not most, of Mr. Connor's encounters with Daniel International workers did not happen under circumstances where Mr. Connor could have been exposed to Appellee's asbestos, because they would have occurred in the P building.

Witherspoon, meanwhile, remembered seeing Daniel International workers throughout the Fiber Industries facility "quite often" from 1968 through 1975, J.A. 378, and testified that he was "certain" that Mr. Connor "would probably have" come into contact with Daniel International workers "once to three times a week" during that time

12

period, *id.* at 385–86. However, this portion of Witherspoon's testimony was based in significant part on Witherspoon's own experience, doing a job at Fiber Industries that was similar to Mr. Connor's. Indeed, although Witherspoon also based his testimony partly on observations of Mr. Connor, *see id.* at 386, when asked to share a "specific memory" of Mr. Connor being around the Daniel International workers, he could not provide one, *id.* at 437.[8]

In our view, the evidence discussed thus far establishes that Mr. Connor spent most of his time at Fiber Industries in the asbestos-free P building, but at times visited the production plant, where Daniel International workers might have been using Appellee's asbestos products. There is no clear indication in the record as to how regularly these forays outside of the P building occurred. However, even if we assume that Mr. Connor regularly encountered Daniel International workers while taking these trips to the production plant, a crucial question remains: were the Daniel International workers using Appellee's asbestos products on these occasions?

There is no evidence that directly supports an affirmative answer to this question. On the contrary, multiple witnesses were asked if they ever saw Mr. Connor near Daniel International crews that were working with Appellee's asbestos insulation, and not a single

---

[8] To be sure, even testimony based solely on a witness's experience doing similar work is not per se irrelevant. *See Shetterly v. Raymark Indus., Inc.*, 117 F.3d 776, 780, 782 (4th Cir. 1997). But whatever the precise weight given to Witherspoon's testimony about the likely frequency of Mr. Connor's contacts with Daniel International workers, there remains a dispositive lack of evidence as to whether such contacts would have involved exposure to Appellee's asbestos products.

one said that they did. For instance, Gary Gibbons, a contemporary of Mr. Connor's at Fiber Industries, was asked whether he "recall[ed] seeing [Mr. Connor] next to any Daniel [International] crews doing any work with insulation," and his answer was, "I never seen it, no sir." J.A. 128. Appellant, who was himself an employee at Fiber Industries from 1968 to 1974, stated that he saw Mr. Connor at "[d]ifferent places" throughout the Fiber Industries facility, including the production plant, *id.* at 521, but never testified that he witnessed Mr. Connor in the presence of Daniel International workers while they were performing maintenance on Appellee's asbestos products. In fact, when Appellant was asked if he ever saw Mr. Connor "in a situation where . . . he was being exposed to asbestos" at Fiber Industries, Appellant responded, "I don't know that." *Id.* at 525. Even Mr. Connor, who recalled seeing Daniel International workers at the Fiber Industries facility on a regular basis, never so much as hinted that he had been exposed to asbestos on any of these occasions.

Lacking any direct evidence, Appellant contends that Mr. Connor's encounters with Daniel International workers *must* have occurred when the workers were using or maintaining Appellee's asbestos products, since this kind of work was Daniel International's primary responsibility and most frequent task at Fiber Industries. But even if insulation work was Daniel International's primary responsibility, it was not *all* the company did at Fiber Industries. *See, e.g.*, J.A. 378–79 (Witherspoon testifying that he was "certain [Daniel International] did other jobs, other than just insulating"). As a result, we cannot conclude that there is a genuine dispute of fact regarding whether Mr. Connor

14

was exposed to Appellee's asbestos products merely from the fact that he came across Daniel International crews while they were working in the production plant.

Additionally, even if removing, replacing, or maintaining Appellee's asbestos insulation was Daniel International's primary task at Fiber Industries, that fact does not help us quantify how frequently Mr. Connor reasonably might have encountered Daniel International crews while they were performing that type of work. The record does not illuminate whether this type of work was performed on a daily, weekly, monthly, or even yearly basis. Appellant claims that the testimony of Witherspoon "establishes that Mr. Connor was around Daniel [International] insulators as they removed and installed insulation," Appellant's Br. 7, but when Witherspoon was asked if he "remember[ed] seeing Daniel [International] employees removing insulation from piping or equipment," he simply speculated, "At times, they would have to," J.A. 379.

Appellant has put forth no evidence that any of the run-ins between Mr. Connor and Daniel International crews that took place outside of the asbestos-free P building occurred when the Daniel International workers were using Appellee's asbestos products. If these encounters happened regularly, one would think that *somebody* -- whether it be Witherspoon, who testified that he saw Mr. Connor at work "virtually every day," J.A. 373, Appellant, who stated that he visited Mr. Connor at "[d]ifferent places" throughout the Fiber Industries facility, *id.* at 521, or Mr. Connor himself -- would have remembered at least one of them. Yet, they did not.

15

2.

Proximity

To satisfy the proximity prong of the *Lohrmann* test, Appellant need only establish that Mr. Connor was close enough to the Daniel International workers to breathe in the asbestos dust that their work produced. The characterization of Mr. Connor's run-ins with Daniel International workers advanced by Appellant in his brief and at oral argument -- that Mr. Connor was just a few feet away from the Daniel International workers, *see* Appellant's Br. 42; Oral Argument at 9:19–42 -- would perhaps satisfy this prong. However, the record belies Appellant's characterization. In reality, Mr. Connor's encounters with Daniel International workers ordinarily did not involve any sort of close or prolonged contact.

Appellant makes much of the fact that Witherspoon testified that he was "certain" that, during the early 1970s, Mr. Connor "probably would have been . . . within two feet of" Daniel International workers at the production plant. J.A. 385–86. However, Witherspoon qualified this assertion as a mere probability and, at a different portion of his testimony, was unable to recall a specific instance where he actually observed Mr. Connor near Daniel International workers.

Appellant also cites the portions of Mr. Connor's deposition where he testified that he occasionally had to grant Daniel International workers "permission to do" certain tasks, J.A. 326, and that he would interfere if he saw Daniel International's "people doing things that would influence [his] people," *id.* at 324. But the record, viewed in its entirety, makes clear that these sorts of interactions were unusual. Indeed, Mr. Connor explained that he

16

ordinarily "didn't have any dealings with" or "speak to" Daniel International workers. *Id.* at 328. Witherspoon likewise stated that Mr. Connor did not supervise Daniel International employees "because they didn't work for him." *Id.* at 436. Moreover, Mr. Connor testified that if he did happen upon Daniel International workers in the production plant, his typical response was to "move on" to a different part of the plant, not to "stand and watch" the workers. *Id.* at 326, 327–28. Given the massive size of the production plant, it is unlikely that Mr. Connor would have been exposed to Appellee's asbestos if he had moved on to a different part of the plant upon seeing Daniel International workers. *See id.* at 118, 126– 27 (Gibbons testifying that the production plant was "[h]uge; absolutely huge" and describing the plant as consisting of four areas, each of which was the size of several football fields); *id.* at 446 (Witherspoon stating that "[y]ou could probably put about three football fields in" the part of the production plant where he worked); *see also Lohrmann*, 782 F.2d at 1162 (explaining that the "size of a workplace" is relevant to the assessment of whether the decedent was sufficiently exposed to the defendant's asbestos).

3.

<u>Appellant's Evidence Fails the Frequency, Regularity, and Proximity Test</u>

In sum, the most that can be reasonably inferred from this record is (1) it was fairly common for Mr. Connor to make a pass through the Fiber Industries production plant; and (2) he regularly saw Daniel International workers while doing so. Perhaps these inferences create a jury question regarding whether Mr. Connor experienced "a casual or minimum contact with" Appellee's asbestos products, *Lohrmann*, 782 F.2d at 1162, but they do not create a genuine issue of material fact on substantial factor causation. "[T]he mere proof

17

that the [decedent] and a certain asbestos product are at [a location] at the same time, without more, does not prove exposure to that product." *Id.* Under North Carolina law, more evidence of frequency, regularity, and proximity -- evidence which "prov[es] that the [decedent] was regularly and frequently in proximity to the defendant's [asbestos] product[s]" -- is needed to send the issue of causation to a jury. *Finch*, 972 F.3d at 513.

Appellant fails the frequency, regularity, and proximity test because, even when viewing the evidence in the light most favorable to him, we can only speculate as to whether any of Mr. Connor's run-ins with Daniel International crews occurred when the workers were using Appellee's asbestos products. And even if we accept that this type of encounter sporadically took place over the course of Mr. Connor's time at Fiber Industries, we still can only speculate as to whether Mr. Connor came close enough to the workers on these occasions for a sufficient period of time to breathe in any asbestos dust produced by their work.

Moreover, the Fourth Circuit asbestos cases that Appellant cites only bolster our conclusion that the causation evidence in this case is woefully insufficient. For instance, Appellant cites *Jones v. Owens-Corning Fiberglas*, where we affirmed the district court's grant of summary judgment in favor of the plaintiffs on the issue of causation. *See* 69 F.3d at 716. In *Jones*, there was "direct evidence" establishing that the plaintiffs "were exposed to asbestos dust on a daily basis . . . for approximately 20 years." *Id.* Specifically, two of the plaintiffs' coworkers had testified that they, along with the plaintiffs, had worked "with and around" the defendant's "asbestos products[] on a regular basis from 1952 to the 1970s." *Id.* This type of direct evidence -- that which connects the plaintiff or decedent to

the defendant's asbestos products without reliance on speculation or a chain of dubious inferences -- is absent from this record.

Meanwhile, *Roehling v. National Gypsum Co. Gold Bond Building Products* is marginally helpful to Appellant because it merely establishes that "direct evidence" showing that the plaintiff or decedent "had contact with" the defendant's asbestos is not required to survive summary judgment. 786 F.2d 1225, 1228 (4th Cir. 1986). But the circumstantial evidence that helped the plaintiff survive summary judgment in *Roehling* was much stronger than the evidence presented here. In *Roehling*, the plaintiff established that the decedent had "worked in the same limited area of the plant at the same time" as insulators whose work with the defendant's asbestos products had generated asbestos dust. *Id.* Here, by contrast, the record establishes only that during Mr. Connor's passes through the massive Fiber Industries production plant, he *might* have encountered Daniel International crews working with Appellee's asbestos insulation, and *might* have been in close enough proximity to the workers to be exposed to Appellee's asbestos.

Indeed, these cases serve to underscore the fact that under North Carolina law, summary judgment should be granted to the defendant if the record evidence "provides no more than mere speculation that" the defendant was a substantial cause of the plaintiff's injuries. *Gibson v. Ussery*, 675 S.E.2d 666, 669 (N.C. Ct. App. 2009). This court has likewise noted, "[A] party cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Dash v. Maryweather*, 731 F.3d 303, 324 (4th Cir. 2013) (internal quotation marks omitted). Because accepting

19

Appellant's theory of causation would require us to do just that, we affirm the district court's grant of summary judgment in favor of Appellee.

C.

The Nature of Mesothelioma and its Relevance to Causation

Appellant also argues that the nature of the underlying disease -- mesothelioma -- must be taken into account in considering causation. Specifically, Appellant contends that because contracting mesothelioma requires less exposure to asbestos as compared with other asbestos-related diseases, "the frequency and regularity prongs" of the *Lohrmann* test should be "less cumbersome when dealing with cases involving" that disease. Appellant's Br. 36 (quoting *Tragarz v. Keene Corp.*, 980 F.2d 411, 420 (7th Cir. 1992)).

Appellant cites *Finch v. Covil Corp.*, 972 F.3d 507 (4th Cir. 2020), a mesothelioma-based wrongful death action governed by North Carolina law, as support for this contention. In *Finch*, the court considered the validity of a jury instruction that instructed the jury to:

> [C]onsider how much [of the defendant's] insulation was in the plant, what portion of that insulation contained asbestos, how closely [the decedent] worked around the places where the [defendant's] asbestos-containing insulation was, the amount of dust from [the defendant's] asbestos-containing insulation products, how long [the decedent] worked in the plant, and other relevant evidence about exposure to asbestos-containing products sold by [the defendant].

*Id.* at 513. Specifically, in *Finch*, the defendant contended that the jury instruction did not place enough emphasis on the frequency and regularity components of the *Lohrmann* test.

20

We upheld the instruction, holding that it "embodies the general principles of law set forth by *Lohrmann*." 972 F.3d at 514 (internal quotation marks omitted).

But, ultimately, we need not decide today whether the nature of the underlying disease impacts the substantial factor causation analysis in asbestos cases. Appellant's argument is not that the *Lohrmann* standard does not apply in mesothelioma cases, but rather that its frequency and regularity prongs should be less onerous in such cases. Whether we accept this argument or not, the fact remains that in order to survive summary judgment, Appellant must establish that Mr. Connor "had more than *de minimis* exposure to asbestos-containing insulation sold by [Appellee]." *Finch*, 972 F.3d at 514 (internal quotation marks omitted). As detailed above, Appellant has not made this showing.

Accordingly, even assuming, without deciding, that the nature of the underlying disease is relevant to the application of the frequency, regularity, and proximity test, we hold that Appellant has not produced sufficient evidence to create a genuine dispute of fact regarding Mr. Connor's exposure to Appellee's asbestos products.

D.

Mr. Connor's Exposure to Asbestos at Norfolk Southern

As a separate basis for concluding that Appellant has not created a genuine dispute of fact regarding causation, we note that whatever level of asbestos exposure Mr. Connor may have experienced at Fiber Industries is dwarfed by the far more frequent, regular, and close-proximity exposure to asbestos that he experienced during his years as a machinist mechanic at Norfolk Southern.

21

Appellant does not dispute that Mr. Connor spent at least seven of his years at Norfolk Southern working directly beside or directly beneath steam engines that were wrapped with insulation. Nor does Appellant dispute Mr. Connor's testimony that the steam engines' insulation was regularly removed and replaced, a process that caused so much asbestos dust to collect on Mr. Connor's clothes that he often had to blow himself off with compressed air. In fact, at oral argument, Appellant conceded that, compared to the asbestos exposure that Mr. Connor experienced at Fiber Industries, Mr. Connor's exposure at Norfolk Southern was "more intense" and more "frequent." Oral Argument at 7:09–40.

Appellant's retort to this point is that Appellee "is not entitled to summary judgment simply because Mr. Connor also had exposure at Norfolk Southern." Appellant's Reply Br. 5. It is true that injuries can -- and often do -- have more than one legal cause. But in tort actions governed by North Carolina law that feature multiple alleged causes for an injury, the plaintiff must establish "that it is more likely than not that the conduct of [a specific] defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough." *Ross v. FDIC*, 625 F.3d 808, 817 (4th Cir. 2010) (applying North Carolina law); *see also Holley v. ACTS, Inc.*, 581 S.E.2d 750, 754 (N.C. 2003) ("[M]ere possibility has never been legally competent to prove causation."). Furthermore, the Restatement (Second) of Torts -- which North Carolina courts often use as a guide when analyzing causation issues, *see Seraj v. Duberman*, 789 S.E.2d 551, 557–558 (N.C. Ct. App. 2016) -- explains that "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it" is an

22

"important" consideration when "determining whether [an] actor's conduct is a substantial factor in bringing about harm to another," Restatement (Second) of Torts § 433 (Am. L. Inst. Oct. 2020 Update).

In light of these authorities, the disparity between the level of asbestos exposure that Mr. Connor experienced at Fiber Industries and the level of exposure that he experienced at Norfolk Southern is material to our assessment of causation in this case. Because the record demonstrates that Mr. Connor was exposed to comparatively little asbestos at Fiber Industries versus his asbestos exposure at Norfolk Southern, Appellant cannot establish more than a *mere possibility* that Appellee's asbestos products were a substantial cause of Mr. Connor's mesothelioma.

A mesothelioma case from the Sixth Circuit, *Moeller v. Garlock Sealing Technologies, LLC*, 660 F.3d 950 (6th Cir. 2011), is compelling on this point. *Moeller* involved Kentucky law, which does not apply the *Lohrmann* test in asbestos cases, but, like North Carolina law, does apply a substantial factor causation standard that is guided by the Restatement (Second) of Torts. *See Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009). The decedent in *Moeller* had been exposed to varying levels of asbestos from multiple sources, and a jury had entered a verdict in favor of the plaintiff. *See* 660 F.3d at 955. The dispositive issue was whether the jury verdict was supported by sufficient evidence demonstrating that the defendant, Garlock's, asbestos was a substantial cause of the decedent's mesothelioma. The Sixth Circuit held that the plaintiff had not made this showing:

23

> While [the decedent's] exposure to Garlock gaskets may have contributed to his mesothelioma, the record simply does not support an inference that it was a *substantial* cause of his mesothelioma. Given that the Plaintiff failed to quantify [the decedent's] exposure to asbestos from Garlock gaskets and that the Plaintiff concedes that [the decedent] sustained massive exposure to asbestos from non-Garlock sources, there is simply insufficient evidence to infer that Garlock gaskets probably, as opposed to possibly, were a substantial cause of [the decedent's] mesothelioma.

*Id.* (emphasis in original). The *Moeller* court concluded by analogizing that "saying that exposure to Garlock gaskets was a substantial cause of [the decedent's] mesothelioma would be akin to saying that one who pours a bucket of water into the ocean has substantially contributed to the ocean's volume." *Id.* Because the evidence demonstrating that Mr. Connor was exposed to Appellee's asbestos is so weak -- especially when compared to the evidence of Mr. Connor's asbestos exposure at Norfolk Southern -- we reach a similar conclusion here.

## IV.

For the reasons set forth herein, the judgment of the district court is

*AFFIRMED*.